## TAYLOR VS. JENKINS.

Where a citizen, during the late civil war, resided within the lines of the con-
federate army, he might, *prima facie*, be considered an enemy to the United
States, and his property enemy's property, and liable to seizure: and so if the
lines be only temporarily extended over him; but if living within the perma-
nently established lines, never thereafter interrupted, he was entitled to the pro-
tection of the law, and his property not subject to seizure except in case of
military necessity.

Soldiers may justify the taking of property under the orders of their com-
manding officers; but they, having a discretion, are liable for taking the citizens,
property without sufficient warrant.

The mere seizure of the citizens' property by unauthorized military power, and
placing it among other property of the United States, without other act of con
demnation, or appropriation to military purposes, does not divest the owner of
his title.

*Appeal from Jefferson Circuit Court.*

Hon. W. M. HARRISON, Circuit Judge.

ENGLISH for the appellant.

If this case is to be tested by the laws of war, the re-capture of
the mule by the confederate scout, and restoration of it to Taylor,
restored his title.

If it is to be tested by the opinion of Chief Justice CHASE in
*Mrs. Alexander's cotton case,* 2 *Wallace,* 420, there was no show-
ing that the mule was subject to capture under the act of con-
gress—no showing that Taylor's title was ever divested by any
legal seizure or confiscation.

Mr. Chief Justice WALKER delivered the opinion of the court.

Jenkins, the appellee, brought his action of replevin in the
Jefferson circuit court against the appellant, Taylor, for a mule.

The defendant filed pleas of *non-cepit* and property in himself;
to which issues were taken, and the cause submitted to the court
sitting as a jury. The court, after having heard the evidence,
declared the law governing its decision, and found the issues for

23

the plaintiff, and rendered judgment thereon accordingly. The defendant moved the court for a new trial, and assigned for cause that the ruling of the court was contrary to law, and that the finding was not warranted by the evidence, which motion the court overruled, and thereupon the defendant excepted, and in his bill of exceptions has made the ruling of the court upon the law, and all of the evidence, part of the record now presented for our consideration.

Although the amount in controversy in this case is small, yet upon looking into the state of facts presented, there are but few questions of more general importance than this is.

It appears from the evidence that Taylor, the defendant in the action of replevin, was the owner of the mule in controversy in the year 1863 ; that he bought the mule from a drover, and had worked it on his plantation for some eight years ; that in 1863, and after the federal army had taken possession of Pine Bluff, near where Taylor lived, a federal scout came to his house, arrested him and one other person there, and holding them in custody, drove off some twelve or sixteen head of Taylor's mules and horses, took them to Pine Bluff, and turned them into a pen in charge of the United States quartermaster. There is no positive evidence that the mule in controversy was one of those taken from Taylor and turned into the lot, but from all the facts and circumstances of the case, there is a strong presumption that such was the case. It is in proof that it was customary with the government officers to brand stock so taken and turned over to the government with the letters "U. S.", but that Taylor's mules were not branded. The mule in controversy had no such brand. As a matter of history, we know that the federal army occupied Pine Bluff early in the fall of 1863, but how long after that it was before the mule was taken from Taylor does not appear in evidence. It appears, however, that shortly before Christmas of that year, a son of the plaintiff traded for the mule from a stranger—who that stranger was, or how he came into possession of the mule, or how long he had been in possession of it, does not

appear; nor is it shown whether he was a soldier of the southern or federal army, or was a citizen in sympathy with either party of the belligerents. The plaintiff proved that he got the mule from his son; that she remained in his possession until the fall of the year 1864, when she was captured and taken from him by Vaughn's company of rebel scouts; that thereafter, the defendant, Taylor, found the mule in the possession of these scouts, claimed and identified the mule as his, whereupon it was delivered to him.

Thus it will be seen, that if Taylor, who beyond all question (according to the evidence) was once the lawful owner of the mule, was divested of his title to it, it was by force of the capture, by which she ceased to be his property and became that of the United States. If such was not the effect of the capture, then the title to the property remained in Taylor. The determination of this question will, in effect, settle also the law with regard to the second capture, and supersede the necessity of a separate investigation of it.

That the late war was a civil war, and that all of the rights of belligerents apply and govern the conduct and the rights of both parties, we may, without reference to authorities, hold to be fully settled in the case of *Hawkins vs. Filkins*, decided at the present term of this court. And we are left to consider whether the capture in this case was such as to divest Taylor of his title to the property, and as a consequence necessarily following, to vest it in the United States.

The first question to be considered is, was the property captured "enemy's property"? To make it such, Creed Taylor, the then owner of the property, must have been an enemy to the United States. If he had resided within what was recognized as enemy's country, that is, within the lines of the Confederate States army, uncertain and difficult as in many instances, it might be to determine certainly where the line was, then, *prima facie*, Taylor might have been considered an enemy, and his property enemy's property; but we are not to be understood as holding

that this presumption might not be removed by evidence tending to show what the real facts were. There were, doubtless, individuals found, both within the federal lines and the confederate lines, who were enemies to one of the respective belligerent parties, and who, when ascertained to be such, might be treated accordingly. It is not necessary, however, in this case, to attempt to lay down any rule for general application, if indeed it would be practicable to do so, because each case must, at least to some extent, depend upon the facts and circumstances connected with it.

In the case under consideration, Taylor resided within the federal lines at the time the property was taken from him. The possession and dominion of the federal government over that part of the state in which Taylor resided, was not temporary, as in the case of the occupation of that part of the state of Louisiana in which Fort De Russy was situated at the time Mrs. Alexander's cotton was captured. In Mrs. Alexander's case, it was argued with much plausibility: "That the moment the people were released from rebel military rule, the political and military power of the usurpers was broken, and the jurisdiction and authority of the United States were supreme. It gave to the loyal citizen that dominion over his property, accompanied with *rights of property* such as he enjoyed before this rebel rule intervened." As a general proposition, this was held to be true, but the court said: "The occupation of that part of Louisiana in which Mrs. Alexander resided, was too limited, and too precarious to change the enemy relation created for the country and its inhabitants, by three years continuous rebellion, interrupted at last, for a few weeks, but immediately resumed, and ever since maintained." 2 *Wallace*, 418.

If, however, the occupation of that part of Louisiana near Fort DeRussy had been permanent, as it was at Pine Bluff and its vicinity, there can be no doubt but that the court would have held the capture of Mrs. Alexander's cotton unlawful, and that she was entitled to compensation for it.

In view of this authority, and guided by the rules which we have stated, it cannot be said that the defendant Taylor was an enemy. He resided at the time the property was taken from him within the established permanent lines of occupation of the federal army, never thereafter interrupted, and had as far as appears in evidence been loyal. The laws of the United States, which had been suspended by forcible adverse occupancy, followed the national flag, and the citizens resident within the territory thus reclaimed, were entitled to the protection of the law. Taylor being thus a resident within such territorial limits was not an enemy, nor was his property subject to seizure for other or different purposes than such as the law of necessity in time of war justifies.

Chancellor KENT, after reviewing the earlier practice under the laws of war, says: "The general usage now is, not to touch private property upon land, without making compensation, unless in special cases, dictated by the necessary operations of war. * * * If the conqueror goes beyond these limits wantonly, or when it is not clearly indispensable to the just purposes of war, and seizes private property of pacific persons for the sake of gain, * * * he violates the modern usages of war, and is sure to meet with indignant resentment, and to be held up to the general scorn and detestation of the world." *Kents Com.*, vol. 1, *pages* 91–93.

In *Mrs. Alexander's cotton case*, Chief Justice CHASE says: "It is true that this rule, as to property on land, has received very important qualifications from usage, from the reasonings of enlightened publicists and from judicial decisions, it may now be regarded as substantially restricted to special cases, dictated by the necessary operation of the war, and as excluding, in general, the seizure of private property of peaceful persons for the sake of gain. The commanding general may determine in what special cases its more stringent application is required by military emergencies."

"By the usages of modern war, the private property of an

enemy is protected from seizure or confiscation as such." *Law-rence Wheaton*, 631.

In the light of these authorities, except in some special cases from the necessity of which the officer in command must act, and in which, in his judgment, it is necessary to take the property to promote the public service, private property is not subject to be taken by the military. The property of Taylor, under the circumstances of the case as presented to us, was not subject to either capture or seizure, by military authority. It is not shown that the capture was made by any order or command of a superior officer, or other directions than that of the witness Jenkins, who states that he was in command of a federal scout, who took the mules from Taylor. The rank or grade of the officer, if such indeed he was, is not stated. The purpose for which the scout was sent out is not shown; nor is there any inference to be drawn from existing circumstances, that mules were needed for military purposes.

It was held by the supreme court of the United States, in the case of *Mitchell vs. Harmony*, 13 *How.*, 134, that even when invading the enemy's country, when each day's march marked the line of enemy's country, the private property of a loyal citizen was not subject to seizure and appropriation, even for public use, nor to prevent its falling into enemy's hands, unless there existed an absolute necessity for doing so, and that, when an order was given to take the property, the discretionary power given the officer must be sustained by the facts then existing. And whilst officers may exercise a discretionary power in effecting that which they are required to perform, soldiers under their command have no such discretion. They act under orders, are in fact the instruments through which orders are carried into effect. Vattel says: "The troops, officers, soldiers, and in general, all of those by whose agency the sovereign makes war, are only instruments in his hands. They execute his will, and not their own." The soldiers, who took the defendant's mules under the orders of an officer (if indeed he was such) might

justify under such order, but, until the officer who commanded the act to be done, be shown to have acted in obedience to some order of his immediate superior, he would stand in the relation of a tresspasser, and as such would be liable for his acts, or the acts of those under his command, and if a tresspasser, then the legal right to the property was not affected by such act.

Whether the mule in controversy was one of those taken and placed in the quartermaster's pen is not very clear; but admitting such to have been the case, there is no proof that the mule was either branded, used or sold by the military authorities, and soon thereafter it was found in the hands of a stranger, but whether a soldier or a citizen does not appear, from whom the son of the plaintiff purchased the mule, and sold it to the plaintiff, who held and claimed it until the fall of 1864, when it was captured from him by a confederate scout, near one Carson's; but whether Carson lived within the federal or the confederate lines does not appear; nor is it shown whether the plaintiff was in sympathy with, or acted with the one or the other party belligerent. In the absence of these facts, we cannot say whether the plaintiff's title was or was not affected by such capture. For aught that appears from the evidence, we might, upon principle, say that it was not; but ot this we need make no further investigation, because we are, in view of the whole case, of opinion that such capture as is shown by the evidence did not divest Taylor of his title to the mule; and that the circuit erred in declaring the law to be otherwise, and upon the state of facts presented, in rendering judgment for the plaintiff; and that for such erroneous ruling of the law and finding, a new trial should have been granted.

Let the judgment be set aside and reversed, and the cause remanded for further proceedings.